No. 2706

Second Circuit

---

HUNTER v. JOHNS, ET AL.

---

(June 30, 1926, Opinion and Decree)

---

(*Syllabus by the Court.*)

1. **Louisiana Digest—Master and Servant —Par. 156, 160 (a).**

Where a truck driver finds hauling to be done, and solicits the owner of a truck to undertake the work and employ him to do it, and the proposal is refused, but the truck driver is permitted to use the truck for the purpose under an agreement whereby he retains twenty-five per cent and pays the owner seventy-five per cent of the amount he receives for the work, less the cost of oil and gasoline consumed in the enterprise, the truck driver is not an employee of the owner of the truck; their relations are rather that of lessor and lessee of the truck, and the truck driver is not entitled to recover compensation from the owner of the truck for injuries sustained by him in the course of the work.

Brown vs. Weber-King Lumber Company, 3 La. App. 596.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo, Hon. E. P. Mills, Judge.

Action by W. B. Hunter against M. E. Johns, et al. There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Long and McSween, of Shreveport, attorneys for plaintiff, appellant.

Alex F. Smith and H. V. Booth, of Shreveport, attorneys for defendants, appellees.

## STATEMENT OF THE CASE

REYNOLDS, J. This is a suit under the Employers' Liability Act by W. B. Hunter against C. C. Woodring, M. E. Johns and H. C. Bellows, to recover compensation for injuries alleged to have been suffered by plaintiff while driving a motor truck from his home to his work.

All three defendants denied liability.

The case was tried and there was judgment rejecting plaintiff's demands and he has appealed.

## OPINION

On the trial of the case the plaintiff dismissed his suit as against M. E. Jones, and in his brief in this court he advances no reason why judgment should be rendered against H. C. Bellows.

Plaintiff's claim against E. C. Woodring turns on the question of whether or not he was at the time of the accident to him an employee of Woodring.

Plaintiff swears that Woodring employed him to drive a motor truck at a stipulated wage of $3.00 per day, but he failed to substantiate this contention. The evidence convinces us that no such agreement was entered into.

C. C. Woodring, referring to plaintiff, testified, pages 40, 41, 42, 43, 54:

"I was sick, as I have said before, and I got tired of standing around the fire, so I walked back to the car and he (plaintiff) said, 'well, do you want the work'? He said, 'Mr. Carmichael has said that he could use a 'Ford truck', and I says 'I don't want to take the work on because I am sick and can't attend to it and see that everything goes on all right', but I said 'if you want to take the car and take the chances on it, you can do it'. And I said 'if you want to take my Ford and keep up the repairs on it and do the work, and give me 75% of what you make on it, or what is taken in, it will be all right; provided that before it is divided you take out and pay for the gas and oil, and I will keep the truck up and you give me 75% of what you take in and you take 25% for doing the work; and he said, 'All right', and Mr. Carmichael and all the others heard this conversation."

* * *

"Q. And Mr. Hunter had already had a conversation with Mr. Carmichael, or had gone in to talk to Mr. Carmichael, before this agreement was made?

"A. Yes, sir.

"Q. And Mr. Hunter was to pay all of the expenses of the oil and gas out of the dollar an hour that he was to get and then he was to give you 75% of what was left?

"A. No, sir, he was to give me the gross receipts of the—he was to take 25% and I was to stand the expenses of the truck, and I was to get 75%.

* * *

"Q. Then he was the first one that importuned Mr. Carmichael to do this work?

"A. He was the first one that spoke of it, and most of the talking was done between him and Mr. Carmichael.

* * *

"Q. Mr. Woodring, as I understand you, you had no contract with Mr. Hunter to pay him so much per hour or so much per day?

"A. No, sir; I was going to give him 25% of the gross amount that was taken in with the truck.

"Q. You were to share in the profits with him, if any there were made on the truck?

"A. Sir?

"Q. You were to share in the profits made on the work on a certain percentage basis?

"A. Yes, sir, that is the way. I was going to give him 25% of the gross proceeds.

* * *

"Q. Did he talk to Mr. Carmichael any before he came back to where you were?

"A. He talked to him; I don't know what he said, though.

"Q. Then after he came out there and all three of you were present, was it your understanding then that Mr. Carmichael was to pay a dollar an hour for the truck while it was working and Mr. Hunter would get 25% of what the truck made while it was working?

"A. Yes, sir.

* * *

"Q. That bargain was agreeable to you?

"A. Well, the bargain that he made with Mr. Carmichael I consented to, of

course, to let him have the truck on that 25% and 75% basis. I considered that Mr. Hunter and I were partners in the thing."

P. C. Carmichael testified, pages 63, 64, 65:

"Q. Did you have any conversation at that time with Mr. Woodring?

"A. Yes, I talked with Mr. Hunter and Mr. Woodring both, and told them if they wanted to put the truck in there for a dollar an hour, for the actual time it worked, we could possibly use it if it wasn't too wet.

\* \* \*

"Q. How did they agree to work it?

"A. I never did know, but they started —He wanted to put a man in there on straight time, but he said he didn't know whether the truck was going to work or not, nor whether he could make the time with it, and then I think they had some agreement about a percentage basis.

"Q. That is what I was coming to. Did you hear them say anything about working on a percentage basis?

"A. Yes, sir, there was some kind of a percentage basis talked about.

"Q. You did hear them say something about a percentage basis?

"A. Yes, sir, Woodring told me that he wouldn't put the truck in there with a man on it if I wouldn't pay him by the day for it, and I told him that I couldn't do that; that I would just pay for the actual time that it worked. And him and Mr. Hunter were speaking about some other way to

work it on a percentage basis, or some other way.

\* \* \*

"Q. Where did they go from there?

"A. He said that he was sick and that he was going home and go to bed, and for me to keep actual time that the truck was working and to pay Mr. Hunter for it."

Alfred Willis testified, pages 69 and 70:

"Q. You mean that you told Mr. Woodring that he couldn't make any money?

"A. Yes, sir. And then he said that he would put the driver on a percentage basis and work everything on percentage.

"Q. Was Mr. Hunter there?

"A. We were all standing right there; Mr. Carmichael, Mr. Woodring, Mr. Hunter, and my brother and several others."

From all the evidence we are convinced that at the time of the accident to plaintiff he was not an employee of C. C. Woodring. Plaintiff was not looking to him for wages, and under the arrangement between them under no circumstances could Woodring owe Hunter any amount as wages. Hunter was looking to Carmichael for pay for his work and if he was working for any one it was for Carmichael. His relations with Woodring was that of lessee of the truck rather than that of an employee of Woodring.

Under all the evidence in the case we are satisfied that the judgment of the lower court is correct and it is accordingly affirmed.